## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ISMAIL A. ALI,

      Plaintiff,

v.

IAN HOLLAND, ATLANTA ALPHA
INVESTMENTS, KUROKAMI
GROUP HOLDINGS LLC, and
YOTSUBA GROUP HOLDINGS,
LLC,

      Defendants.

Civil Action No.
1:22-cv-03791-VMC

## ORDER

Before the Court is Plaintiff's Motion for Default Judgment. ("Motion," Doc. 19).[1]

## Background[2]

Defendant Ian Holland is a Georgia resident and the sole officer of Defendants Atlanta Alpha Investments, Yotsuba Group Holdings, LLC ("Yotsuba

---

[1] The Court previously sealed Docs. 13, 14 and 16. The Court will direct the Clerk to unseal these docket entries after 30 days following the date of entry of this Order unless Mr. Ali files an objection to this aspect of this Order within that time.

[2] The Court takes the following well-pleaded factual allegations from the Complaint as true according to the legal standard discussed below.

Group"), Kurokami Group Holdings LLC ("Kurokami Group").[3] (Doc. 1 ¶¶ 10–12). Beginning since at least July of 2020, these Defendants initiated a scheme and artifice by which they created the false appearance that they were engaged in providing legitimate financial services, including but not limited to the marketing and selling of securities. (*Id.* ¶ 15). In July 2020, Mr. Holland began making representations to Plaintiff Ismail Ali's daughter that he had founded an investment fund via Atlanta Alpha Investments, which bought and sold securities on behalf of several investors. (*Id.* ¶ 16). For example, on July 22, 2020, Mr. Holland sent Mr. Ali's daughter an email with the subject, "Investment vehicle Overview," including as an attachment, a document titled, "Atlanta Alpha Investments, General Equity Partnership – AAI Accelerated Equity Investment Vehicle Overview." (Docs. 1 ¶ 17, 1-1).

Mr. Ali was introduced by his daughter to Mr. Holland in or around April of 2021, for the purpose of seeking advice on real estate opportunities in the Atlanta market. (Doc. 1 ¶ 24). Mr. Ali's daughter had known Mr. Holland for several years, understood that he and his family owned some multifamily properties in Atlanta, and that Mr. Holland had a level of familiarity and contacts

---

[3] Atlanta Alpha Investments purports to be an entity but is not a corporation or other organization under Georgia or other state's laws. (Doc. 1 ¶ 11). As of the filing of the Complaint, Yotsuba Group was administratively dissolved by the Georgia Secretary of State. (*Id.* ¶ 12).

in the local real estate market. (*Id.* ¶ 25). When introduced to Mr. Ali in April 2021, Mr. Holland represented that he was an investment professional and currently held the position of "Chief Acquisitions Officer" for Atlanta Alpha Investments. (*Id.* ¶ 26). Mr. Holland initially represented to Mr. Ali that he and Atlanta Alpha Investments provided advice and real estate investment opportunities for individuals such as Mr. Ali. (*Id.* ¶ 27).

After Mr. Holland was introduced to Mr. Ali, he provided a document for Mr. Ali via e-mail to Mr. Ali's daughter on April 5, 2021, titled: Yotsuba Group Real Estate Investment Consulting Analysis and Consulting for Acquisition and Development. (The "Yotsuba Group Document"). (*Id.* ¶ 28). The Yotsuba Group Document purported to give a "Professional Assessment" of one real property with improvements, and concluded with a proposal for services for Acquisition, Pre-Development, Development, and Post-Development. (*Id.* ¶ 29).

After Mr. Ali informed Mr. Holland that he was not interested in the subject property in the Yotsuba Group Document, Mr. Holland informed Mr. Ali about opportunities to acquire "off market properties" in the Atlanta real estate market (the "Off Market Opportunities"). (*Id.* ¶ 30).

Mr. Holland informed Mr. Ali that as a prerequisite to present him with the Off Market Opportunities for investment, Mr. Ali needed to provide Mr. Holland

with "proof of funds" to show that Mr. Ali had available assets to invest in the Off Market Opportunities. (*Id.* ¶ 31).

In response to Mr. Holland's request for proof of funds for the Off Market Opportunities, Mr. Ali provided his March 2021 Ameritrade brokerage account statement (the "March 2021 Ameritrade Statement") to Mr. Holland. (*Id.* ¶ 32). Mr. Ali's March 2021 Ameritrade Statement showed various stocks Mr. Ali owned, including a substantial number of shares Mr. Ali owned in Netflix, Inc. (symbol NFLX). (*Id.* ¶ 33). Upon receiving the March 2021 Ameritrade Statement and seeing Mr. Ali's stock holdings, Mr. Holland recommended to Mr. Ali that Defendants Holland and Atlanta Alpha Investments sell "covered calls" on Mr. Ali's stocks, which Mr. Holland explained was a strategy that could be used to generate income for Mr. Ali in the form of options premiums. (*Id.* ¶ 34).

Mr. Holland solicited and represented to Mr. Ali that by selling "covered calls" on Mr. Ali's stocks, Mr. Holland could create passive income for Mr. Ali without creating a taxable event (the "Covered Call Opportunity"). (*Id.* ¶ 35). Mr. Holland solicited a fifty-percent (50%) share of the profits generated from the covered call sales as compensation for providing the Covered Call Opportunity to Mr. Ali. (*Id.* ¶ 36).

4

On August 31, 2021, Mr. Holland prepared and sent via electronic mail for

Mr. Ali, a document titled "General Holdings Analysis for Mr. Ismail A. Ali,"

wherein Mr. Holland wrote, in pertinent part:

> This is a great return of around 10% a quarter but can be increased without risk by selling call derivatives against your holdings, specifically netflix. The easiest and best way to do this is to sell covered calls, which is effectively a contract giving someone the option to buy your shares at a higher price at a later time.
>
> […]
>
> By selling these derivatives not only would you be able to take advantage of the natural appreciation of price but also the premium of people insuring themselves against price action. This is the only "riskless" derivative we consider in the options market as the only risk is the unrealized new gain between the date of sale and expiration.
>
> […]
>
> Conclusion:
>
> I'd recommend that any liquidation should come from the NTFX holdings as that is almost entirely unrealized gains at a very discounted rate. Also due to the premiums around such a popular equity, calls should be sold aggressively against them since there is only unrealized gain at risk and zero loss.
>
> From this position I recommend liquidating around a third of the holdings to contribute to real estate, which should allow for two or so properties at the 2M dollar lvl and sell call derivatives against the rest.

> By doing this you would avoid all downturns and could use the premium gains to repurchase shares, purchase new equities, or as a form of income.

(*Id.* ¶ 37; Doc. 1-2).

Mr. Holland also presented Mr. Ali with pricing information concerning certain purportedly unlisted or off-market real properties in the Atlanta market, but said that the Off Market Opportunities were going quickly, and not to invest in real estate, but that the Covered Call Opportunity was the better investment for Mr. Ali. (Doc. 1 ¶ 38).

Mr. Ali was not familiar with covered calls and declined Mr. Holland's solicitation for the Covered Call Opportunity, and ultimately decided not to pursue the Off Market Opportunities or to engage Mr. Holland or Atlanta Alpha Investments for any services. (*Id.* ¶ 39). Mr. Ali alleges that upon information and belief, at all relevant times, Mr. Holland and Atlanta Alpha Investments did not hold a securities license of any kind, or were otherwise authorized to lawfully solicit the sale of securities. (*Id.* ¶ 40).

In or around February of 2022, Mr. Holland, in his individual capacity and purportedly as Chief Acquisitions Officer for Atlanta Alpha Investments, contacted Mr. Ali and offered again to provide the Covered Call Opportunity, but this time with 100% of the profits for the covered call transactions going to Mr. Ali. (*Id.* ¶ 41). Mr. Holland, in his individual capacity and as Chief Acquisitions Officer

for Atlanta Alpha Investments, promoted the Covered Call Opportunity and solicited Mr. Ali's engagement of Mr. Holland's and Atlanta Alpha Investments' services. (*Id.* ¶ 42). Mr. Ali did not understand how the Covered Call Opportunity was supposed to work, particularly how Mr. Holland would be able to sell covered calls on Mr. Ali's behalf and offer Mr. Ali 100% of the profits, or why it would be advantageous or profitable to Mr. Holland and Atlanta Alpha Investments. (*Id.* ¶ 43). Consequently on Mr. Ali's behalf, Mr. Ali's daughter requested that Mr. Holland document the Covered Call Opportunity in writing, including the terms and conditions, and all extraneous details, so that Mr. Ali could fully understand what Mr. Holland was proposing. (*Id.* ¶ 44).

On February 8, 2022, Mr. Holland sent an e-mail to Mr. Ali's daughter with the subject line, "Covered Call Opportunity for Ali Family Trust," and purporting to be from Mr. Holland in his capacity as Founder of Defendant Kurokami Group Holdings, LLC. (*Id.* ¶ 45; Doc. 1-3). In the February 8, 2022 e-mail, Mr. Holland wrote the following, in pertinent part:

> Proposal:
>
> Allow Kurokami Group to sell covered calls for you for a term of six to twelve months as a form of month to month income generation in order to either increase your currently held position or simply as passive cash flow.
>
> • You will not be required to sell any shares.
>
> • We do not require access to your account.

• We can begin with a small sample size of 5-10 contracts so that you can judge the viability via real world results.

• You will receive a monthly update via this platform breaking down the profits each week as well as a TD Ameritrade trade summary showing each trade as confirmed for your own auditing processes.

• Should you decide to exit for any reason your shares shall be returned within 45 days. As per our delta strategy shown in the video section above, inspired by Tony Zhang of CNBC.

• 100% of the profit shall be yours as delivered via TD Ameritrade internal transfer or wire transfer to the bank of your choosing.

Thanks!

I really appreciate your time and look forward to working with you!

Ian Holland - Founder of Kurokami Group Holdings

Ian@atlantaalphainvestments.com

762 244-0285

(Doc. 1 ¶ 46; Doc. 1-3).

After receiving the February 8th e-mail from Mr. Holland, Mr. Ali and his daughter scheduled a video conference call with Mr. Holland for February 16, 2022, for Mr. Holland to explain all the items in the February 8th e-mail. (Doc. 1 ¶ 49). Mr. Ali's daughter, on his behalf, requested that prior to the February 16, 2022 meeting, Mr. Holland send all paperwork to her so that she could vet it before having her father review it or engage in anything he was unfamiliar with. (*Id.*

8

¶ 50). Mr. Ali and his daughter were planning to have the paperwork reviewed by a reputable financial advisor that could verify the legitimacy of the Covered Call Opportunity. (*Id.* ¶ 51).

On February 15, 2022, Mr. Holland sent an email to Mr. Ali and his daughter, with the subject line, "Investment Deployment for the Ali Family Trust," (*Id.* ¶ 52; Doc. 1-4).

Although Mr. Ali had never agreed to engage Mr. Holland or his companies, Atlanta Alpha Investments, Yotsuba Group, or Kurokami Group for any service, Mr. Holland wrote in the February 15, 2022 email to Mr. Ali and his daughter:

> Hello!
>
> I'm so happy to begin working with you both on the development of the Ali Family Trust! You shall both be receiving an invitation for the execution of said contract via Honeybook.com in your email. Please execute or respond with any concerns or questions to this email as soon as possible to make sure that the dates within said contract are contemporaneous as required by the SEC.
>
> Attached is the transfer form for Mr. Ali for the initiation of the Honeybook.com contract. Mr. Ali should review and execute the procedural contract received via HONEYBOOK.COM before he executes the internal transfer form attached so as to protect his personal interest.
>
> --
>
> Ian Holland
>
> Chief Acquisitions Officer

762 244 0285

Atlanta Alpha Investments

atlantaalphainvestments.com

(*Id.* ¶ 53; Doc. 1-4). Attached to the email, Mr. Holland included a TD Ameritrade Internal Transfer Form, the stated purpose of which is: "Use to transfer fund/securities from an existing TD Ameritrade brokerage account to another new or existing TD Ameritrade brokerage account." ("TD Ameritrade Transfer Form"). The TD Ameritrade Transfer Form was dated 2/16/2022, listed as transferor the brokerage account for Mr. Ali, and as the transferee, an account for Mr. Holland, and listed 1,000 shares of Netflix stock. (Doc. 1 ¶ 54). Via separate e-mail communication, Mr. Ali received the "procedural contract" referenced in Mr. Holland's February 15, 2022 email, a document titled "Derivatives based Trust Investment for Mr. Ismail Ali," (*Id.* ¶ 55; Doc. 1-5). Neither Mr. Ali nor anyone on his behalf ever signed the purported "Derivatives based Trust Investment for Mr. Ismail Ali" contract. (Doc. 1 ¶ 56).

Mr. Holland met with Mr. Ali and his daughter by videoconference on February 16, 2022, pursuant to an invitation via e-mail from Mr. Holland. (*Id.* ¶ 57). During the February 16, 2022 meeting, Mr. Holland further attempted to persuade and convince Mr. Ali to engage him and the services of Kurokami Group and Atlanta Alpha Investments for the Covered Call Opportunity. (*Id.* ¶ 58). Mr. Ali

decided not to engage Mr. Holland or the services of Kurokami Group and Atlanta Alpha Investments but instead halted all communications with Mr. Holland after the February 16th videoconference. (*Id.* ¶ 59).

On June 1, 2022, Mr. Ali reviewed his Ameritrade account and discovered that 1,000 shares of his Netflix securities had been transferred and removed from his account. (*Id.* ¶ 60). After Mr. Ali notified Ameritrade of the transfer and that he had not authorized any transfer of his securities, it was determined that the 1,000 shares of Netflix had been transferred to Mr. Holland on March 7, 2022. (*Id.* ¶ 61).

Pursuant to its investigation, Ameritrade produced to Mr. Ali a TD Ameritrade Transfer Form dated March 4, 2022, purportedly signed by Mr. Ali (the "March 4th Transfer Form"). (*Id.* ¶ 62; Doc. 1-6).  Mr. Ali alleges that on information and belief, and as a first predicate act, all Defendants conspired together to obtain Mr. Ali's brokerage account information and create the forged March 4th Transfer Form. (*Id.* ¶ 63). The signature on the March 4th Transfer Form is a forgery. (*Id.* ¶ 64). It is not the signature of Plaintiff Ismail Ali, nor does it look like his signature. (*Id.*). Defendants, working in concert, caused the March 4th Transfer Form to be transmitted via facsimile on March 4, 2022, from Atlanta, Georgia, to Ameritrade, in Omaha, Nebraska, the brokerage firm holding Mr. Ali's brokerage account. (*Id.* ¶ 68). The shares of Netflix securities were each valued at

$350.26 when they were transferred to Mr. Holland's account on March 7, 2022. (*Id.* ¶ 72).

Defendants were served by personal delivery to Mr. Holland on September 29, 2022. (Doc. 7–10). The Clerk entered Defendants' defaults on December 13, 2022. The Motion was filed on May 1, 2023, and no response was filed to the Motion.

## Legal Standard

If a defendant fails to plead or otherwise defend a lawsuit within the time required by Federal Rule of Civil Procedure 12(a)(1)(A), upon motion, the clerk must enter default against the defendant pursuant to Federal Rule of Civil Procedure 55(a). A default constitutes admission of all well-pleaded factual allegations contained in the complaint, but is not considered an admission of facts that are not well-pleaded or conclusions of law. *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005). "Before a default can be entered, the court must have subject-matter jurisdiction and jurisdiction over the party against whom the judgment is sought, which also means that the party must have been effectively served with process." 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2682 (4th ed. 2008) (citations omitted).

Once a default has been entered, the Court has the "discretion in determining whether the judgment should be entered." *Patray v. Nw. Publ'g, Inc.*,

931 F. Supp 865, 868 (S.D. Ga. 1996) (internal footnote and citation omitted); Fed. R. Civ. P. 55(b); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1576 (11th Cir. 1985) ("The entry of a default judgment is committed to the discretion of the district court.").

The Eleventh Circuit has made clear that entry of judgment by default is not granted as a matter of right and is judicially disfavored because there is a "strong policy of determining cases on their merits." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1244–45 (11th Cir. 2015) (citation omitted); *see also Mitchell v. Brown & Williamson Tobacco Corp.*, 294 F.3d 1309, 1316–17 (11th Cir. 2002) ("Entry of judgment by default is a drastic remedy which should be used only in extreme situations, . . . we must respect the usual preference that cases be heard on the merits rather than resorting to sanctions that deprive a litigant of his day in court.").

Entry of default judgment is only warranted when there is "a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F. 2d 1200, 1206 (5th Cir. 1975). Although *Nishimatsu* did not elaborate as to what constitutes "a sufficient basis" for the judgment, courts have subsequently interpreted the standard as being akin to that necessary to survive a motion to dismiss for failure to state a claim. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n. 41 (11th Cir. 1997) ("[A] default judgment cannot stand on a

complaint that fails to state a claim."). Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim. *See Wooten v. McDonald Transit Assocs., Inc.*, 775 F.3d 689, 695 (5th Cir. 2015) (stating in the context of a motion for default judgment, "whether a factual allegation is well-pleaded arguably follows the familiar analysis used to evaluate motions to dismiss under Rule 12(b)(6)").

When evaluating a motion to dismiss, a court looks to see whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556); *Surtain*, 789 F.3d at 1245 (footnote omitted). "The court must therefore examine the sufficiency of plaintiff's allegations to determine whether plaintiff is entitled to an entry of judgment by default." *Fidelity & Deposit Co. of Md. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988). The Supreme Court has explained that the pleading standard of Rule 8 of the Federal Rules of Civil Procedure "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation

14

of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotations omitted).

"This analysis is equally applicable to a motion for default judgment." *Edenfield v. Crib 4 Life, Inc.*, No. 6:13-CV-319-Orl-36KRS, 2014 WL 1345389, at *2 (M.D. Fla. Apr. 4, 2014) (adopting Report and Recommendation) (citing *De Lotta v. Dezenzo's Italian Rest., Inc.*, No. 6:08-CV-2033-Orl-22KRS, 2009 WL 4349806, at *5 (M.D. Fla. Nov. 24, 2009)).

Further, the Court may only enter a judgment by default without a hearing where the amount of damages is a liquidated sum or one capable of mathematical calculation. Fed. R. Civ. P. 55(b): *Jenkins v. Clerk of Court*, 150 F. App'x 988, 989 (11th Cir. 2005). Whether to hold a hearing is committed to the Court's discretion. *DIRECTV, Inc. v. Huynh*, 318 F. Supp, 2d 1122, 1129 (M.D. Ala. 2004) (citing Fed. R. Civ. P. 55(b)(2)).

A plaintiff requesting a default judgment award under Rule 55(b)(1) must provide an affidavit and evidence supporting that it is entitled to a specific, certain sum of money. *Lubin, Sarl, a French Co. v. Lubin N. Am., Inc.*, No. 1:13-CV-2696-AT, 2014 WL 11955396, at *2 (N.D. Ga. Apr. 10, 2014). "A claim is not a sum certain unless there is no doubt as to the amount to which a plaintiff is entitled as a result of the defendant's default. Examples of actions seeking a sum certain include

actions on money judgments and negotiable instruments." *Id.* (citations and internal punctuation omitted).

## Discussion

Plaintiff's Complaint raises five counts: Count One for violation of the Federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961–68; Count Two for violation of Georgia RICO, O.C.G.A. §§ 16-14-1 et seq., Count Three for Civil Theft; Count Four for Fraud; and Count Five for Punitive Damages. The remainder of this Order proceeds in order of Counts One through Four, and then considers damages.

## I.    Federal RICO

"To state a claim under RICO a plaintiff must allege each of the following four elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)). Additionally, in a civil case, a plaintiff must show "(5) injury to business or property (6) that was by reason of the substantive RICO violation." *MasTec Renewables P.R. LLC v. Mammoth Energy Servs., Inc.*, 494 F. Supp. 3d 1233, 1239 (S.D. Fla. 2020) (quoting *Corcel Corp., Inc. v. Ferguson Enters., Inc.*, 551 F. App'x 571, 575 (11th Cir. 2014)).

16

### A.    Defendants constituted an enterprise.

Mr. Ali alleges that Mr. Holland and the Defendant entities constituted an enterprise under RICO. "A RICO enterprise is 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (quoting 18 U.S.C. § 1961(4)). Thus, even though Atlanta Alpha Investments is not a legal entity, Defendants' use of that association is probative of an enterprise.

As the Supreme Court has explained,

> an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in Turkette, an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."

*Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The Court finds that based on Mr. Holland's representations to Mr. Ali that Atlanta Alpha Investments provided advice and real estate investment opportunities for individuals such as Mr. Ali, (Doc. ¶ 27), as well as Mr. Holland's repeated use of the different Defendant entities in proposals offered to Mr. Ali, (*id.* ¶¶ 29, 46), Mr. Ali has presented sufficient evidence of an enterprise.

**B.    Mr. Ali failed to show Defendants engaged in a pattern of racketeering activity.**

Next, the Court considers whether Mr. Ali has established a pattern of racketeering activity. "RICO defines racketeering activity as any act indictable under 18 U.S.C. §§ 1341 and 1343, the mail and wire fraud provisions, or 'any offense involving . . . fraud in the sale of securities.'" *Durham*, 847 F.2d at 1511 (citing 18 U.S.C. § 1961(1)). "To establish a pattern of racketeering activity there must be at least two predicate acts of racketeering activity." *Id.* (citing 18 U.S.C. § 1961(5)). "Although two predicate acts are a prerequisite to establishing a pattern of racketeering activity, they are not by themselves sufficient." *Id.* (citing *Sedima*, 473 U.S. at 496 n. 14). Interpreting the *Sedima* language, the Eleventh Circuit has stated that "to establish a pattern there must be a showing of more than one racketeering activity and the threat of continuing activity." *Id.* (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir. 1986), *abrogated in part on other grounds*, *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993)).

However, "[a]cts that are part of the same scheme or transaction can qualify as distinct predicate acts." *Bank of America Nat'l Tr. & Sav. Ass'n,* 782 F.2d at 971. "The standard which has been applied in this Circuit is whether each act constitutes 'a separate violation of the [state or federal] statute' governing the conduct in question . . . . If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which

they arose." *Id.* (citing *United States v. Watchmaker*, 761 F.2d 1459, 1475 (11th Cir. 1985)). "[M]ost courts have rejected the claim that predicate acts which are proximate in time do not demonstrate the 'continuity' necessary for proof of a RICO offense." *Watchmaker*, 761 F.2d at 1475 (citing *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105 (1975)).

Mr. Ali alleges that Defendants engaged in acts indictable under four statutes in Title 18 enumerated in 18 U.S.C. § 1961(1): Section 1028 (Identity Fraud), Section 1343 (Wire Fraud), Section 1344 (Bank Fraud), and Section 1942 (Money Laundering). The Court addresses each of these in turn.

Identity Fraud (18 U.S.C. § 1028)

18 U.S.C. § 1028 criminalizes identity fraud and states in relevant part:

> (a) Whoever, in a circumstance described in subsection (c) of this section—
>
> . . .
>
>> (7) knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law;
>
> . . .
>
> shall be punished as provided in subsection (b) of this section.
>
> . . .

19

(c) The circumstance referred to in subsection (a) of this section is that—

. . .

(3)(A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means . . . .

18 U.S.C. § 1028.

As Mr. Ali correctly notes, in interpreting the aggravated identity theft statute (Section 1028A), which shares a definition section with identity fraud under Section 1028, courts including the Eleventh Circuit have held that a forged signature constitutes a means of identification. *United States v. Blixt*, 548 F.3d 882, 886 (9th Cir. 2008); *accord United States v. Little*, 552 F. App'x 937, 938 (11th Cir. 2014). The Court can reasonably infer that Defendants possessed the means of identification with the intent to commit a violation of Federal law, because Mr. Holland did in fact commit such a violation as described below.

Moreover, the Court finds that Defendants possessed the means of identification in interstate commerce because Mr. Holland obtained the information necessary to complete the TD Ameritrade Transfer Form by soliciting Mr. Ali to provide a copy of his March 2021 Ameritrade Statement containing the Netflix shares by email. (Doc. 1 ¶¶ 31–33). Accordingly, Mr. Ali has alleged facts, deemed admitted, necessary to establish an indictable offense of identity fraud.

20

<u>Wire Fraud (18 U.S.C. § 1343)</u>

18 U.S.C. § 1343 criminalizes wire fraud and states in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. The Complaint alleges, and the Court must deem admitted, the allegation that Defendants, working in concert, caused the March 4th Transfer Form to be transmitted via facsimile on March 4, 2022, from Atlanta, Georgia, to Ameritrade, in Omaha, Nebraska, the brokerage firm holding Mr. Ali's brokerage account. (*Id.* ¶ 68). Defendants devised a scheme to obtain the Netflix shares by getting information about Mr. Ali's brokerage account and forging his signature. Accordingly, Mr. Ali has alleged facts, deemed admitted, necessary to establish an indictable offense of wire fraud.

<u>Bank Fraud (18 U.S.C. § 1344)</u>

18 U.S.C. § Section 1344, prohibits bank fraud and states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
>> (1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. Title 18 of the U.S. Code defines "financial institution" as follows:

(1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);

(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;

(3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;

(4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;

(5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);

(6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act;

(7) a Federal Reserve bank or a member bank of the Federal Reserve System;

(8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

(9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); or

(10) a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.

18 U.S.C. § 20. None of these types of institutions appear to cover TD Ameritrade, Inc., an SEC-registered, FINRA/SIPC member broker-dealer.[4] In fact, other criminal contexts such as the Sentencing Guidelines reflect a recognition that these types of entities are not included in Section 20's definition. *See* U.S. Sent'g Guidelines Manual § 2B1.1 cmt. n.1 (U.S. Sent'g Comm'n 2023) ("'Financial institution' includes any institution described in 18 U.S.C. § 20 . . . [and] brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission . . . ."). As such, Mr. Ali has not met his burden of alleging bank fraud.

<u>Money Laundering and Unlawful Proceeds Transfers (18 U.S.C. §§ 1952, 1956–57)</u>

Finally, Mr. Ali alleges that by selling and distributing the proceeds of the Netflix shares, Mr. Holland engaged in further predicate acts. First, Mr. Ali alleges that, by engaging in four separate transactions to sell the 1,000 shares from March

---

[4] *See EDGAR entry for TD Ameritrade, Inc.*, SEC.gov, https://www.sec.gov/edgar/browse/?CIK=277841 (last visited February 22, 2024), *BrokerCheck entry for TD Ameritrade, Inc.*, FINRA.org, https://brokercheck.finra.org/firm/summary/7870 (last visited February 22, 2024); *List of Members*, SIPC.org, https://www.sipc.org/list-of-members/ (last visited February 22, 2024).

9, 2022 to April 20, 2022, Mr. Holland violated 18 U.S.C. §§ 1956 and 1957, both of

which are predicate acts under 18 U.S.C. § 1961(1).

However, section 1956 (sometimes called promotional money laundering)

does not squarely fit here.

> To prove a defendant committed money laundering
> under 18 U.S.C. § 1956(a)(1)(A)(i), the Government must
> show that the defendant "engaged in financial
> transactions with the knowing use of the proceeds of
> illegal activities and with the intent to promote the
> carrying on of unlawful activity." *United States v.
> Hudspeth*, 525 F.3d 667, 679 (8th Cir. 2008) (internal
> quotations omitted); see also *United States v. Warshak*, 631
> F.3d 266, 317 (6th Cir. 2010). More precisely, the
> Government must prove that the person (1) conducted a
> financial transaction (such as purchasing property) with
> the proceeds of "specified unlawful activity" (2) with the
> knowledge that the proceeds came from "some form of
> unlawful activity" and (3) with the intent "to promote
> the carrying on of specified unlawful activity." 18 U.S.C.
> § 1956(a)(1)(A)(i); see 18 U.S.C. § 1956(c)(4)(A)(iii); see
> also 18 U.S.C. § 1956(c)(3) (defining "transaction" to
> include a "purchase").

*United States v. 275 Milton Rahn Rd. Rincon, Ga. 31326*, No. 4:18-CV-299, 2022 WL

969621, at *6 (S.D. Ga. Mar. 30, 2022). While the Motion conclusorily alleges that

"[t]hese four sales of Netflix securities constitute criminal racketeering pursuant

to 18 U.S.C. Sections 1956 and 1957," the Motion does not explain how the sales

promoted further specified unlawful activity.[5]

---

[5] Section 1956 also prohibits transactions designed "to conceal or disguise the
nature, the location, the source, the ownership, or the control of the proceeds of

On the other hand, Section 1957 (sometimes called transactional money laundering) does appear to apply to Mr. Holland's liquidation of the Netflix shares on the TD Ameritrade platform. That section criminalizes, under certain circumstances, any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The statute goes on to define monetary transaction as

> the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument (as defined in section 1956(c)(5)[6] of this title) by, through, or to a financial institution (as defined in section 1956 of this title), including any transaction that would be a financial transaction under section 1956(c)(4)(B)[7] of this title . . . .

18 U.S.C. § 1957(f)(1). The definition of financial institution under Section 1956 and 1957 are broader than under the bank fraud statute, and include "any financial institution, as defined in section 5312(a)(2) of title 31, United States Code," which

---

specified unlawful activity," but the Motion makes no argument that the sale of the shares itself concealed any aspect of the transaction, as the proceeds were deposited into an account owned by Mr. Holland. 18 U.S.C. § 1956 (a)(1)(B)(i).

[6] Under 1956(c)(5), "monetary instruments" includes investment securities. 18 U.S.C. § 1956.

[7] Section 1956(c)(4)(B) refers to "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956.

in turn includes "a broker or dealer registered with the Securities and Exchange Commission." 18 U.S.C. § 1956(c)(6); 31 U.S.C. § 5312(a)(2)(G). As explained by the Motion and supporting exhibits, the four transactions that resulted in the liquidation of the Netflix shares each totaled more than $10,000. (Doc. 19 at 21). Moreover, as the architects behind the identify theft and original wire fraud, Defendants knew that the transaction involved proceeds of criminally derived property. As such these four sales constituted further predicate acts.

Lastly, the Motion alleges that

> after selling the 1000 shares of Netflix, Defendant Holland made a total of eighteen (18) separate wires of cash proceeds to his banking accounts, between March 9, 2022, to June 9, 2022, totaling $219,200.00: four (4) wires to a Wells Fargo Bank account in California, and fourteen (14) wires to a Truist Bank account in Georgia.

(Doc. 19 at 22). Mr. Ali contends that these wire transfers constituted interstate transfer of proceeds of unlawful activity under 18 U.S.C. § 1952. That statute criminalizes any person who

> (a) . . . uses the mail or any facility in interstate or foreign commerce, with intent to--

> > (1) distribute the proceeds of any unlawful activity . . .

> and thereafter performs or attempts to perform--

> > (A) an act described in paragraph (1) . . .

26

18 U.S.C. § 1952. Mr. Ali correctly notes that the definition of "unlawful activity" includes transactional money laundering as found above. The Court also agrees that the wiring of funds constitutes a "facility in interstate . . . commerce." However, Mr. Ali has not explained how Mr. Holland's transfer of the cash from the shares into Mr. Holland's bank accounts equates to distribution. "The word 'distribute' carries a connotation of distribution of illegal proceeds to persons in organized crime conspiracies." *United States v. Cole*, 704 F.2d 554, 558 (11th Cir. 1983) (citing *United States v. Lightfoot*, 506 F.2d 238, 242 (D.C. Cir. 1974)); *cf. also* Eleventh Circuit Pattern Jury Instructions (Criminal Cases) O83.2, O83.4A, O83.4B (2022) ("[To 'distribute' something simply means to deliver or transfer possession of it to someone else, with or without any financial interest in the transaction.]"). It is the act of handing over that is the prohibited act. *Cole*, 704 F.2d at 558. Here, however, there is no distribution or handing over to another person. Mr. Holland only transferred the funds to himself. The Court finds that the 18 wires from Mr. Holland's TD Ameritrade accounts to his bank accounts were not predicate acts.

<u>Threat of Continuing Activity</u>

Having found that the Defendants engaged in at least two predicate acts, the Court must finally consider whether Mr. Ali has established "the threat of continuing activity." *Durham*, 847 F.2d at 1511 (quotations omitted).

27

"[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima*, 473 U.S. at 497 n.14 (quoting 18 U.S.C. § 3575(e)); *accord Touche Ross & Co.*, 782 F.2d at 971 ("In this case the banks have alleged nine separate acts of wire and mail fraud, involving the same parties over a period of three years, for the purpose of inducing the banks to extend credit to International Horizons. Under *Sedima* the complaint satisfies the pattern requirement.").

"The 'continuing nature' of the criminal conduct, set forth in the third prong, can be established in one of two ways: relying on either a closed- or open-ended theory of continuity." *MasTec Renewables*, 494 F. Supp. 3d at 1239 (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). "The former theory refers to 'a closed period of repeated conduct,' while the latter implicates 'past conduct that by its nature projects into the future with a threat of repetition.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 241). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242). "A RICO action, however, will often 'be brought before continuity can be established in this way.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242). "'In such cases,' then, a plaintiff must rely on an open-ended theory and establishing liability on that basis 'depends on whether

28

the threat of continuity is demonstrated.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 242).

"The continuity aspect of a RICO claim is vitally important because 'RICO was designed to create liability for longstanding racketeering activity, and not isolated schemes.'" *Id.* (quoting *Emess Capital, LLC v. Rothstein*, No. 10-60882-CIV, 2011 WL 13214302, at *6 (S.D. Fla. Mar. 9, 2011), *report and recommendation adopted,* 2011 WL 13214308 (S.D. Fla. Dec. 21, 2011)).

Mr. Ali cannot "show closed-ended continuity because there is only one victim . . . , and 'only a single scheme with a discrete goal' connecting the predicate acts . . . but "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Daedalus Cap. LLC v. Vinecombe*, 625 F. App'x 973, 976 (11th Cir. 2015) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1267 (11th Cir. 2004)).

As to open-ended continuity, Mr. Ali has presented evidence that for close to two years, Mr. Holland represented that the Defendant entities could provide legitimate financial advisory services when in fact they were a cover for Mr. Holland to commit fraud. As of the filing of the Complaint, Kurokami Group still maintained an active registration with the Secretary of State of Georgia (Doc. 1 ¶ 13). However, even so, the Eleventh Circuit has declined to find open-ended continuity where "[t]here is no threat that [the schemer's] alleged pattern of

racketeering activity will continue into the future because their goal has been realized . . . ." *Vinecombe*, 625 F. App'x at 976–77; *see also Vicom, Inc. v. Harbridge Merch. Servs.*, Inc., 20 F.3d 771, 782 (7th Cir.1994) ("In assessing whether a threat of continued racketeering activity exists, we have made clear that schemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity."). Accordingly, the Court finds that Mr. Ali has failed to meet his burden of establishing a federal RICO claim. However, Mr. Ali also alleges a Georgia RICO claim and "Georgia RICO is generally broader in scope than federal RICO," and so the Court next turns to this claim. *Marshall v. City of Atlanta*, 195 B.R. 156, 171 (N.D. Ga. 1996) (citations omitted).

## II.  Georgia RICO

Mr. Ali's claim under Georgia's RICO statute, O.C.G.A. § 16–4–1 et seq., mirrors his federal RICO claim. "The terms of section 16–14–6(c) (persons injured by reason of section 16–14–4 have a cause of action) and section 16–14–4 (prohibited activities) are similar enough to the federal RICO statute to apply the same analysis." *Morast v. Lance*, 631 F. Supp. 474, 481 (N.D. Ga. 1986), *aff'd,* 807 F.2d 926 (11th Cir. 1987), *abrogated in part on other grounds by O'Neal v. Garrison*, 263 F.3d 1317, 1321 (11th Cir. 2001).

"Under Georgia RICO, the same acts of mail and wire fraud [as well as identity fraud and money laundering] that qualify as predicate acts under Federal RICO also qualify as predicate acts under Georgia RICO." *Turk v. Morris, Manning & Martin, LLP*, 593 F. Supp. 3d 1258, 1299–300 (N.D. Ga. 2022), *reconsideration denied*, 661 F. Supp. 3d 1276 (N.D. Ga. 2023) (citing O.C.G.A. § 16-14-3(5)(C)). Moreover, unlike under the federal RICO definitions, Georgia RICO defines a pattern of racketeering activity to include "**one or more** incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." O.C.G.A. § 16-14-3(4)(A) (emphasis added); *accord Wylie v. Denton*, 746 S.E.2d 689, 693 (Ga. Ct. App. 2013) "Importantly," and critically for this case, "unlike for Federal RICO claims, plaintiffs do not have to show continuity to establish a pattern of racketeering activity under Georgia RICO." *Turk*, 593 F. Supp. 3d at 1299–1300 (citing *Chesapeake Emps. Ins. Co. v. Eades*, 77 F. Supp. 3d 1241, 1256 (N.D. Ga. 2015)).

Accordingly, because Georgia RICO does not require showing continuity, Mr. Ali has established a Georgia RICO claim for the same reasons the Court gave above.

## III.  Civil Theft

Mr. Ali next brings a claim for civil theft. "Georgia law authorizes the owner of property to bring a civil action to recover damages from any person who either (1) willfully damages the owner's personal property or (2) commits a theft as defined in OCGA § 16-8-2." *Edible IP, LLC v. Google, LLC*, 869 S.E.2d 481, 484–85 (Ga. 2022) (citing O.C.G.A. § 51-10-6(a)).

> OCGA § 16-8-2, in turn, provides that
>
> [a] person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated.

*Id.* O.C.G.A. § 16-1-3 (13) broadly defines "property" as including "intangible personal property," which would therefore cover the Netflix shares. *Id.*[8] The Court agrees with Mr. Ali that the above facts constitute a theft as contemplated by Georgia statutory law, and accordingly Mr. Ali has established a civil theft claim.

---

[8] While "[c]onversion is not available as a cause of action with respect to intangible property representing an interest in a business," it appears that a statutory civil theft remedy is available for such property. *S. Cellular Telecom, Inc. v. Banks*, 431 S.E.2d 115, 120 (Ga. Ct. App. 1993).

## IV.    Fraud

Mr. Ali lastly brings a claim for fraud.  Under Georgia law, "[a] fraud may be committed by acts as well as words." O.C.G.A. § 51-6-4(a). To establish fraud based upon a false representation, the plaintiff must show a:

> (1) false representation made by defendant; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting in reliance by plaintiff; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff . . . . [A] plaintiff asserting a fraud claim must show not only that [it] relied on some misrepresentation, but also that [its] reliance was reasonable.

O.C.G.A. § 51-6-2(a); *W. Asset Mgmt., Inc. v. NW Parkway, LLC*, 784 S.E.2d 147, 159 (Ga. Ct. App. 2016) (quoting *Alvear v. Sandy Springs Toyota, Inc.*, 775 S.E.2d 172 (Ga. Ct. App. 2015)). "Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action." O.C.G.A. § 51-6-2(a).

Moreover, "[f]raud is not committed by wilful misrepresentation alone but in this regard is subtle and can be accomplished in an infinite number of ways including signs and tricks and even, in some instances, by silence." *Fed. Ins. Co. v. Westside Supply Co.*, 590 S.E.2d 224, 229 (Ga. Ct. App. 2003) (quoting *Infinity Ins. Co. v. Martin*, 524 S.E.2d 294 (Ga. Ct. App. 1999)). And "misrepresentation may be perpetuated by acts as well as words, and by artifices designed to mislead." *W.*

*Asset Mgmt.*, 784 S.E.2d at 159 (quoting *Batey v. Stone*, 192 S.E.2d 528 (Ga. Ct. App. 1972)).

The Court finds that Defendants engaged in an artifice designed to mislead Mr. Ali by posing as a legitimate investment firm for the purpose of inducing Mr. Ali to provide them the information necessary to deprive Mr. Ali of his Netflix shares. Under the circumstances, including Mr. Holland's pre-existing relationship with Mr. Ali's daughter, and the veneer of legitimacy created by Defendants' multiple fictitious offers, reliance on any misrepresentation that Defendants were legitimate investment advisors was justifiable. (Doc. 1 ¶ 17, 24–25). Mr. Ali has therefore established a claim for fraud.

## V.    Damages

All of Mr. Ali's proven claims against Defendants subject him to liability for compensatory damages for value of the stolen Netflix shares at the time of the deprivation. O.C.G.A § 16-14-6(c); O.C.G.A. § 51-10-6(a)(1) (civil theft); *Barnette v. Peace*, 395 S.E.2d 916, 917 (Ga. Ct. App. 1990) (fraud). Mr. Ali's Complaint alleges that Defendants stole 1,000 shares of Netflix securities each valued $350.26 on March 7, 2022, for a combined loss of $350,260.00. (Doc. 1 ¶¶ 2, 72). The Court accepts this calculation as to compensatory damages.

Georgia RICO provides for mandatory treble damages and attorney's fees, which the Court will award. O.C.G.A § 16-14-6(c). Mr. Ali's claims for Georgia

RICO as well as for fraud authorize punitive damages. O.C.G.A §§ 16-14-6(c), 51–12–5.1(f). However, the Court does not think the additional deterrence of punitive damages is necessary in light of the mandatory treble damages.[9]

Mr. Ali's counsel, Vernon Strickland, billed 83.47 hours at $400 per hour for a total of $33,388. The Court finds that $400 per hour is a reasonable rate based on Mr. Strickland's experience and the prevailing Atlanta market rates. However, the Court finds that about four hours billed between 9/21/2022 and 10/3/2022 constitute administrative tasks which could have been performed by a non-lawyer. Accordingly, the Court will allow these four hours at a rate of $150, or $600, which results in a deduction of $1,000. Moreover, the Court finds that about five hours billed between 10/28/2022 and 10/31/2022 related to the Motion for Default Judgment (Doc. 12) which the Court denied without prejudice due to failure to follow applicable procedures, and the Court will disallow this amount which results in a deduction of $2,000. However, the Court finds the remaining fees of $30,388 and costs of $731.57 reasonable and will allow them.

As a final matter, the Court cannot enter a judgment against Atlanta Alpha Investments because it is an unincorporated association that lacks the capacity to

---

[9] Mr. Ali contends that the Court should consider the possibility of disgorgement in fashioning a punitive damages award, but the Court thinks the availability of actual and treble damages is sufficient to make Mr. Ali whole and deter future misconduct by Defendants.

be sued. Rule 17 governs the capacity of parties and provides in relevant part as follows:

> (b) Capacity to Sue or Be Sued. Capacity to sue or be sued is determined as follows:
>
>> (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile;
>>
>> (2) for a corporation, by the law under which it was organized; and
>>
>> (3) for all other parties, by the law of the state where the court is located, except that:
>>
>>> (A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws . . .

As the forum state, Georgia law thus governs capacity to sue an unincorporated entity. But Georgia "recognizes only three classes as legal entities, namely: (1) natural persons; (2) an artificial person (a corporation); and (3) such quasiartificial persons as the law recognizes as being capable to sue." *Cravey v. Se. Underwriters Ass'n*, 105 S.E.2d 497, 500 (Ga. 1958) (quoting *Parker v. Bd. of Educ. of Sumter Cnty.*, 70 S.E.2d 369 (Ga. 1952)). "Thus an unincorporated association may not sue or be sued in its own name unless authorized by law." *Id.* Mr. Ali submitted no evidence that Atlanta Alpha Investments is a partnership or other entity permitted by Georgia law to sue or be sued. O.C.G.A. § 14-8-7 (test for determining

36

partnership's existence). And while Rule 17(b)(3)(A) would permit a suit to enforce a right under federal law such as federal RICO against an unincorporated action, the Court has held that Mr. Ali failed to state a claim under Federal RICO. Moreover, Mr. Ali does not seek any injunctive relief against Atlanta Alpha Investments and the Court cannot ascertain any purpose served by a money judgment against it. Accordingly, the Court will dismiss Atlanta Alpha Investments without prejudice.

### Conclusion

For the above reasons, it is

**ORDERED** that the Motion for Default Judgment (Doc. 19) is **DENIED IN PART** as to Defendant Atlanta Alpha Investments and **GRANTED IN PART** as to all other Defendants. The Clerk is **DIRECTED** to enter judgment dismissing Defendant Atlanta Alpha Investments without prejudice and further entering judgment in favor of Plaintiff and against the remaining Defendants in the amount of $1,050,780 plus attorney's fees in the amount of $30,388 and expenses in the amount of $731.57. The judgment shall bear interest at the federal judgment rate.

(continued on following page)

The Clerk is **FURTHER DIRECTED** to close the case, but to submit this matter to the undersigned following 30 days after the date of entry of this Order for the purpose of determining whether to unseal Docs. 13, 14 and 16.

    **SO ORDERED** this 12th day of March, 2024.

Victoria Marie Calvert
United States District Judge